## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 02: 05cr0367 |
| | ) | |
| TIMOTHY D. HALL and | ) | |
| JUSTIN D. TOWLER | ) | |

### MEMORANDUM OPINION AND ORDER OF COURT

July 5, 2006

Defendants, Timothy D. Hall ("Hall") and Justin D. Tower ("Towler"), were indicted by a Grand Jury on December 2, 2005, and each charged with one count of Possession of a Firearm By A Convicted Felon on or about December 31, 2004, in violation of Title 18, United States Code, section 922(g)(1).  Currently before the Court are the following pretrial motions:

- MOTION TO SUPPRESS PHYSICAL EVIDENCE (1 BLACK RUGER .40 CALIBER P94 HANDGUN, SERIAL NO. 340-71592), filed by Defendant Hall (*Document No. 35*); and

- MOTION TO SUPPRESS PHYSICAL EVIDENCE (ONE 9 MILLIMETER CALIBER HANDGUN, SERIAL NO. EXU166US), filed by Defendant Towler (*Document No. 36*).

On March 6 and 14, 2006, the Court conducted an evidentiary hearing on the Motions to Suppress at which all parties were represented by counsel who presented and argued the issues skillfully and effectively.  Detective Scott Love and Sergeant Jason Snyder of the City of Pittsburgh Police Department testified on behalf of the government.  Ralph Bergin, Jr., and

Tavius Smith[1] testified on behalf of the Defendants and Officer Edward Fallert, with the City of Pittsburgh Police Department, was called as a witness by the Defendants.  Defendant Hall took the stand in his own defense.

At the conclusion of the suppression hearing, the transcript of the proceedings was ordered by the Court, which was filed on March 28, 2006.  Thereafter, the Court issued a post-hearing briefing schedule for the parties to file briefs in support of their respective positions.  The post-hearing briefs were timely filed and the matter is now ripe for disposition.

Based on the testimony and evidence presented at the suppression hearing, the applicable law, and having made credibility determinations,[2] the Court enters the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Criminal Procedure 12(d):

## FINDINGS OF FACT

a.      *Testimony of Detective Scott Love*

Detective Scott Love ("Love") testified that he has been a narcotics detective with the City of Pittsburgh for nine (9) years and is assigned to areas known for high drug, gun, and

---

[1]      On March 14, 2006, the government recalled Tavius Smith to the witness stand.

[2]      The determinations turn almost entirely on credibility assessments.  As juries are regularly instructed, there is no magic formula for determining how much weight to give the testimony of a particular witness, or how to credit testimony which contains discrepancies.  If a witness has testified falsely as to any material fact, the entire testimony of that witness may be disregarded upon the principle that one who testifies falsely about one material fact is likely to testify falsely about everything.  However, such a witness need not be found totally unworthy of belief.  A factfinder may accept so much of the such testimony as believed to be true, and disregard what is believed to be false.

2

crime areas.  (Transcript at 7.)  On December 31, 2004, at approximately 2:20 a.m., Love and

Detectives Fallert and Lewis and Sergeant Snyder were in an unmarked police vehicle

patrolling around the 28th Street area of the City of Pittsburgh.  (*Id.*)  The police officers were

stopped at the intersection of 28th Street and Liberty Avenue and could hear a vehicle

approaching with "very loud amplified music," which caused the windows on the police vehicle

to vibrate.   As the vehicle approached the intersection, Love observed that it was a white GMC

Yukon.  The vehicle stopped at the light at the intersection, and "the sound was coming from in

excess of 75 feet which is a city ordinance."[3]  (*Id.* at 8.)   Love testified that when he first heard

the music, the Yukon was "approximately 150 to 200 feet" away from the police vehicle. (*Id.* at

9.)

Love testified that the loud music was what drew his attention to the Yukon, but as

he looked at the vehicle, he noticed that the windows "were tinted to the point we couldn't even

see inside.  We couldn't see who the driver, passenger, whether it was occupied, none of those

things."[4]  (*Id.* at 8.)

---

[3]     Although Detective Love did not identify the City Ordinance, in the government's
brief submitted post-hearing, attached as Exhibit 1 is the City of Pittsburgh's
summary local noise control ordinance 601.04(e)(1) which prohibits "amplified
noise from vehicles . . . which is plainly audible to an officer at a distance for
seventy-five (75) feet from the source of the noise."

[4]     Attached as Exhibit 2 to the government's post-hearing brief is Pennsylvania's
Motor Vehicle Code, 75 Pa. C.S.A. § 4524(e)(1) which states, in pertinent part, that
"[n]o person shall drive any motor vehicle with . . . material which does not permit
a person to see or view the inside of the vehicle through the windshield, side wing
or side window of the vehicle."  During the hearing, none of the government's
witnesses specifically referenced the Motor Vehicle Code or this particular
provision.

Directly behind the Yukon was another vehicle.  As the Yukon made a right onto 28th Street, the police activated their emergency lights and sirens and pulled behind the second vehicle.  As the second vehicle pulled over, the police went around it and got behind the Yukon.  The Yukon, however, did not stop, but rather increased his speed, "failed to use its turn signal, turned right onto Paulouna Street, failed to stop for a stop sign also, continued up Paulouna Street, and also continued at a high rate of speed."  (*Id*. at 10.)  The Yukon was forced to stop due to traffic at the intersection of Bigelow and Paulouna.[5]

When the Yukon stopped, Love and Detective Lewis approached the Yukon on the driver's side.  Sergeant Snyder used a "megaphone" and instructed the driver to turn off his vehicle.  Love testified that as he approached the Yukon he displayed his badge but did not have his gun drawn.

Love testified that they were "going to take [the driver] into custody for fleeing and eluding," in violation of section 3733 of the vehicle code  (*Id.* at 14.)  Love ordered the driver out of the vehicle and as the driver exited the Yukon, Love observed a large bulge ("a large piece of metal") in the front part of his waistband.[6]  (*Id.* at 14, 17.)  Love testified that based on his training and experience he knew that the bulge in the driver's waistband was consistent with a firearm.  Love immediately conducted a pat down of the driver's waistband area where he saw the bulge and secured the firearm from Defendant's waistband.

---

[5]    During the "chase," Sergeant Snyder called out a police radio broadcast that they were in pursuit of a white Yukon vehicle and several marked units responded to their location at Paulouna and Bigelow.  (*Id.* at 11.)

[6]    On cross-examination Love testified that Defendant was wearing a multi-colored leather jacket which was open/unbuttoned.

The driver was then taken into custody and Love asked him "shortly thereafter" if he had a permit to carry a firearm, which the driver informed him he did not.  Love identified Defendant Timothy D. Hall as the driver of the Yukon.

Love and his fellow officers subsequently filed state misdemeanor charges against Hall for fleeing and eluding and filed summary offenses against Hall for having excess noise in the vehicle and for the vehicle having heavily tinted windows.

B.      *Testimony of Sergeant Jason Snyder*

Sergeant Jason Snyder ("Snyder") testified that he has been a narcotics sergeant with the City of Pittsburgh for approximately twelve (12) years.  On December 31, 2004, he was working in a plainclothes capacity with Detectives Fallert, Love, and Lewis.  (*Id.* at 43.) Snyder testified that as their unmarked vehicle approached the red light at 28th and Liberty, the police could hear loud music well in excess of 75 feet.  The police determined that the loud music was coming from a white GMC Yukon, with dark tinted windows which stopped at the red light on Liberty at 28th Street.

As the Yukon proceeded up 28th Street with a second vehicle behind it, the police activated their wig-wag headlights and dashboard red/blue lights as they set out in pursuit of the Yukon.  Shortly thereafter the intervening vehicle pulled over and stopped as the police continued to pursue the Yukon which was speeding up toward Bigelow Boulevard.

Snyder testified that after the Yukon stopped, he "went right up to the front passenger side of the vehicle."  (*Id.* at 50.) Snyder identified Defendant Justin D. Towler as the passenger in the Yukon.  Snyder heard Love say that he had recovered a firearm on the driver of the

vehicle and knew that the driver had been taken into custody.  Thereafter, Snyder asked Towler

if he had a driver's license, "because if he had a driver's license, [and] if the operator gave his

permission, [the passenger] could drive the vehicle from the scene." (*Id.* at 52.)  Towler

replied, however, that  he did not have a driver's license.  Snyder also asked Towler if he had a

firearm, to which Towler responded,"No." Snyder testified that during their conversation, he

noticed that Towler "appeared to be extremely nervous.  By that I mean, I could see his chest

rise and fall rapidly, like he was breathing hard, and I could actually see like small beads of

sweat start to form on his forehead." (*Id.* at 52).

Because Towler did not have a valid driver's license, the police called for a tow for

the Yukon and Snyder asked Towler to get out of the Yukon.  Towler complied and as he

stepped out of the Yukon, Snyder testified that he noticed that Towler cocked "his right arm

tight against his body."   Snyder again asked Towler if he had any weapons on him and after

pausing, Towler again replied, "no."  Snyder testified that he then asked Towler to take his arm

away from his body; Towler complied briefly, but immediately put his arm back against his

body.

Snyder testified that, based on his experience, he knew that 75% of the time the most

common place for a person to conceal a firearm is on "the right side of their waistband." (*Id.* at

54.)[7]  Snyder then proceeded to pat down Towler's right side, felt a firearm and recovered a

Glock, Model 40 with a laser, from the right side of Towler's waistband.   Towler was taken

---

[7]     On cross-examination Snyder acknowledged that Towler was wearing a buttoned
coat and that he did not observe a bulge in Towler's waistband.

into custody and a check of the state index system revealed that Towler did not have a permit to carry a firearm.

C.      *Testimony of Officer Edward Fallert*

Officer Fallert ("Fallert") was called to the witness stand by Defendant Towler.  The parties stipulated that Fallert is a City of Pittsburgh police officer, that he was on duty during the night of December 31, 2004,  and that he was the driver of the unmarked police vehicle which eventually pulled over the Hall vehicle.   As part of his duties, he had the responsibility of writing the investigative report relative to this incident.

After reviewing the report, Fallert testified that the printed report was missing a sentence, to wit:  "Towler stated he didn't have a license but he still appeared extremely nervous."  Transcript at  88.  It is Fallert's belief that this line somehow was "cut off" and did not print.   Fallert never wrote an addendum or correction page to correct the error.

D.      *Testimony of Ralph Bergin, Jr.*

Ralph Bergin, Jr. ("Bergin"), is a licensed private investigator and the President of Bergin Investigation, Inc.   At the request of counsel for Hall, Bergin prepared a map, a video re-enactment, and obtained satellite photographs along the route from Liberty and 28th Street through Paulouna Street at or near the Bigelow Boulevard intersection.  According to his calculations, the total distance from the location where the Hall vehicle accessed 28th Street to the location where it was pulled over on Paulouna Street totaled .52 miles, slightly over half a mile. (Transcript at 96-97.)  The photographs which were admitted into evidence and the video

reenactment of the route traveled by the vehicles included not only distance but also travel time at Defendant's estimate of speed and Defendant's contention of front and rear visibility from their vehicle.

E.       *Testimony of Tavius Smith*

Tavius Leni Smith ("Smith") testified on behalf of Defendants that during the late evening hours of December 30, 2004, he was at Bash, a nightclub in the Strip District, with Timothy Hall, Justin Towler, and Eugene Frezzell.  The four men left Bash when the bar closed and were on their way, in two separate vehicles, to an after-hours club when the police pulled Hall's vehicle over.  Smith was driving a "Grand  SUV Tahoe, Chevy Tahoe" and Eugene Frazell was his passenger; Hall was driving a white Chevy Yukon and Towler was his passenger.  Smith was "right behind" Hall as they drove down Liberty and accessed 28th Street. (Transcript at 99-100.)  He said there was no car behind him and that he never pulled over on the bridge.

Smith testified that he first saw police lights "at the top of the hill . . . As soon as I started making the left [onto Paulouna], I seen a [unmarked car with lights flashing] come flying up behind me after I made the left."  (Transcript at 104.)  Smith pulled over and the police car "flew around him."  According to Smith, Hall drove approximately "twenty feet, 20 yards" before he pulled over.

Smith saw the police step out of their car, "pull out their guns and get on the loud speaker."  (Transcript at 105.)  A police officer "pulled" Hall out of his car, and another officer "waved us to come through and then we went through."  (*Id*. at 107.)

8

Smith testified that prior to turning onto Paulouna, he did not see the police car or see police lights.  (*Id.* at 109.)


F.      *Testimony of Eugene Frezzell*

Eugene Frezzell ("Frezzell") testified on that on December 31, 2004 at 2:30 A.M. he was the passenger in the vehicle being driven by Tavius Smith from Bash in the Strip District to the Travelers Club.  Frezzell stated that he never noticed any police lights until Tavius Smith pulled his car over and they drove by.  When the police stopped behind the Hall vehicle, Frezzell testified that he saw four (4) police officers get out of the unmarked car, with their guns drawn and he heard a megaphone telling the driver to put his arms out the window.  He saw Hall get out of the car with a multi-colored jacket on, but he did not see Towler get out of the car.  After ten minutes or so, a uniformed officer directed them around the Hall vehicle and they left the scene.


G.      *Testimony of Defendant Timothy D. Hall*

Timothy D. Hall ("Hall") testified that he was on his way to the Travelers Club, an after-hours bar, when the police pulled up behind him on Paulouna Street.  He did not see any police car or lights until the police car came around Smith's vehicle.  Hall testified that he pulled over because he thought the police were going to go around him too.  When Hall pulled over, the police vehicle also stopped and four police officers got out of the car, opened his door with guns drawn, and one of the officers pulled him out of the car.  The police then allegedly searched Hall's vehicle.

Hall testified that he was outside his car "around 20 minutes" before the police searched him and found his gun.  (Transcript II at 44.)  Once the police found the gun, Hall was arrested and placed in a marked police car.

Hall confirmed that his car windows were tinted "so that you can't see in."  Hall also testified that he did not hear the police sirens "probably because [his] music was up." (Transcript II at 46.)


H.      *Credibility Determination*

Having reviewed the testimony at the hearing, observed the demeanor of the witnesses, and considered the self interests of the witnesses, the Court finds the testimony of Detective Love and Sergeant Snyder to be more credible than the testimony of Defendant Hall and witness Tavius Smith.  The Court makes this determination for several reasons.  First, both officers testified consistently regarding to the loud music and tinted windows of Hall's vehicle. For example, both officers testified that the approaching loud music caught their attention and that the music volume was in violation of a City of Pittsburgh noise ordinance.  Not only is there nothing to contradict the sworn testimony of the officers, the fact remains that Defendant Hall testified that he did not hear the police siren "probably" because of the loud music in his car.

Next, Detective Love testified that as Hall got out of his vehicle, he saw a large bulge, which he recognized as a firearm, and immediately proceeded to pat down Hall.  In contrast, Hall testified that he was standing outside of his vehicle for about twenty (20) minutes before the police searched him.  The Court finds that Defendant Hall's testimony of standing

10

around for over twenty minutes before being searched is less than credible.  It strains credulity that the police would "pull" the Defendant out of his car and then wait over twenty minutes to search or pat him down when officer safety and concern for the presence of weapons is invariably a paramount concern at an arrest scene.

Both Detective Love and Sergeant Snyder are experienced law enforcement officers, who testified clearly and unhesitatingly.  Both testified that when they saw the vehicle being driven by Hall they knew that Hall (i) was in violation of the Motor Vehicle Code because of the vehicle's dark tinted windows and (ii) was in violation of a City of Pittsburgh ordinance because of the loud music.  Moreover, both testified that Hall had committed a misdemeanor when he did not stop after the police turned on their siren and flashing light signals.  Further, the testimony of the police with respect to having called out a radio broadcast of their pursuit of the Hall vehicle was confirmed by the timely convergence of several marked police cars at the Paulouna Street and Bigelow Boulevard intersection at the time the Hall vehicle stopped.

On the other hand, Defendant Hall had much to gain by persuading the Court that this was a "pretext arrest" so that the police "could stop the car, arrest the driver, and subsequently search the driver."  Def's Mot. at ¶ 7.  Lastly, the credibility of both Hall and Smith was impeached under F.R.E. 609 by the testimony that each of them had a number of prior convictions of record.  On balance, the Court finds the testimony of Detective Love and Sergeant Snyder more credible than that of Defendant Hall and his witness.

## CONCLUSIONS OF LAW

The Fourth Amendment of  the United States Constitution protects individuals from "unreasonable searches and seizures."  *U.S. Const. amend. IV.*   Stopping a car and detaining its occupants is considered a "seizure" and, therefore, subject to the protections of the Fourth Amendment, including a requirement of reasonableness under the circumstances.  *United States v. Hensley*, 469 U.S. 221, 226 (1985).  On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable.  *United States v. Ritter,* 416 F.3d 256, 261 (3d Cir. 2005).

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  *Whren v. United States*, 517 U.S. 806, 810 (1996).  In summarizing the applicable law on searches of drivers and passengers in vehicles, the Court of Appeals for the Third Circuit has held as follows:

> A police officer who observes a violation of state traffic laws may lawfully stop the car committing the violation. *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977).  It is also well settled that a police officer executing such a stop may exercise reasonable superintendence over the car and its passengers.  Under *Mimms,* the officer may order the driver out of the vehicle without any particularized suspicion. *Mimms*, 434 U.S. at 110-11, 98 S.Ct. at 333.  The Supreme Court extended that bright line rule to allow the officer to order any passengers out of the car as well.  *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997).  Alternatively, the officer may order all of the occupants to remain in the car with their hands up.  *United States v. Moorefield*, 111 F.3d 10 (3d Cir.1997).  In addition, the officer may pat down the occupants of the vehicle and conduct a search of the passenger compartment, if he has a reasonable suspicion that the occupants might be armed and dangerous. *Michigan v. Long*, 463 U.S. 1032, 1049-50, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983) (permitting search of vehicle during traffic stop); *Mimms*, 434 U .S. at 111-112, 98 S.Ct. at 334 (permitting pat down of driver upon reasonable suspicion); *Terry v. Ohio*, 392 U.S. 1, 17, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968); *Moorefield*,

111 F.3d at 13-14 (permitting pat down of passenger upon reasonable suspicion).

*United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004).

In the instant case, Detective Love testified that he stopped the Yukon because (i) the excessively loud music was in violation of a Pittsburgh local ordinance; (ii) the windows were heavily tinted in violation of the Pennsylvania Motor Vehicle Code; and (iii) that after  the police activated their lights and sirens, the driver increased his speed and pulled away from the detectives in violation of the Pennsylvania Motor Vehicle Code.

Defendant Hall argues that "the initial stop of the vehicle was much more than an investigatory detention or traffic stop; the stop of the vehicle was a full-blown arrest for which there was insufficient information to establish probable cause and no exigent circumstances." Def's Br. at 2.   However, the Court finds and rules that initially when the police officers heard the loud music and saw the heavily tinted windows, they had a reasonable and articulable suspicion that not only had a violation of the Pittsburgh City noise ordinance occurred, but that a violation of the Pennsylvania Motor Vehicle Code had occurred as well.   Furthermore, the Court finds and rules that after the police activated their siren and flashing lights and Hall did not stop, but rather increased his speed, the police had more than sufficient probable cause to stop and arrest Hall for the misdemeanor violation of Fleeing or Attempting to Elude Police, in violation of the Pennsylvania Motor Vehicle Code.

Defendant Towler argues that "[t]he fact that [he] appeared nervous cannot support a finding of probable cause to justify an illegal search" of his person.   However, contrary to Defendant's argument, Sergeant Snyder testified that Towler's extreme nervousness was but

13

one factor among several, which included heavy breathing, sweating, hesitation in responding to questions regarding possession of a gun immediately after a gun had been recovered from the driver and  the fact that Towler continued to hold his right arm tight against his body, all of which in combination formed Sergeant Snyder's decision to pat down Towler.

The Court also notes that it is well established that once a motor vehicle has been stopped for a traffic violation, an officer does not violate the Fourth Amendment by requiring persons in the automobile to get out of the automobile.  The United States Supreme Court has noted that the danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car and "the additional intrusion on the passengers is minimal."  *Maryland v. Wilson*, 519 U.S. 408, 414 (1997).


## CONCLUSION

Based on the applicable legal principles, and the testimony of Detective Love and Sergeant Snyder, the Motions to Suppress filed by the Defendants will be denied.


McVerry, J.

14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 02: 05cr0367 |
| | ) | |
| TIMOTHY D. HALL and | ) | |
| JUSTIN D. TOWLER | ) | |

## ORDER OF COURT

AND NOW, this 5th day of July, 2006, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** as follows:

(i)     the MOTION TO SUPPRESS EVIDENCE filed by Defendant Timothy D.

Hall (*Document No. 35)* is **DENIED;** and

(ii)     the Motion to Suppress Evidence filed by Defendant Justin D. Towler

*(Document No. 36)* is **DENIED**.

A status conference with counsel is hereby scheduled on **Tuesday, July 11, 2006 at**

**8:15 A.M.** before the undersigned.


BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge


cc:     Ross E. Lenhardt,
        Assistant U.S. Attorney
        Email: Ross.Lenhardt@usdoj.gov

        G. William Bills, Jr., Esquire
        Email: gwilliambills@yahoo.com

        David A. Regoli, Esquire
        Email: dregoli@georgeandjoseph.com